EDWARD J. REILLY et al., complainants,

*v.*

LOUIS E. BROWN et al., defendants.

[Submitted July 17th, 1924. Decided August 11th, 1924.]

**Conveyances—Setting Aside of—Alleged Fraud—Conveyor Not of Ordinary Mentality—Adequacy of Consideration—Accounting.**

On bill, &c.

*Mrs. Mary Wooster Sutton,* for the complainants.

*Messrs. Reilly, Quinn & Parsons* and *Mr. Charles E. Cook,* for the defendants Louis E. Brown, Reilly Storage and Transportation Company and Mabel G. McCormick.

*Messrs. John S. Applegate & Son,* for the defendants Myron V. Brown and Augustus M. Minton.

FOSTER, V. C.

The bill in this cause seeks to have certain conveyances set aside on the ground that they were obtained fraudulently and as a result of a conspiracy among some of the defendants, or, in, the alternative, that they be decreed to be mortgages, and also for an accounting and for other relief.

The deeds attacked are, a deed from complainants to the defendant Myron V. Brown, dated August 24th, 1920, and duly recorded and conveying certain premises in Red Bank, in Monmouth county, and a deed for the same premises from Myron V. Brown and wife to the Reilly Storage and Transportation Co., Inc., dated May 12th, 1921; both of these conveyances were made subject to five mortgage encumbrances, amounting to about $21,000, and also other en-

cumbrances, such as taxes, water rents, &c., amounting to about $1,500, or a total of $22,500, in liens.

It was developed at the hearing that the defendant Myron V. Brown is a nephew of Louis E. Brown, and at the conclusion of the hearing, and before the accounting, I announced that I found Myron V. Brown had failed to account for about $50 belonging to the complainant Reilly, which he had received as part of the consideration of $1,500, paid him by the Reilly Storage and Transportation Co., or Louis E. Brown, for making the conveyance to the company above mentioned.

It was also shown that the defendant Miss McCormick is and has been the secretary of Louis E. Brown for several years, that she is a notary public, and as such that she took the acknowledgment of complainants to some, if not all, of the mortgages, chattel mortgages and deeds for the premises in question, and which are involved in this controversy, and I find no evidence to support the charge that she was a party to any fraud or conspiracy to deprive Reilly of his property.

From the proofs it appears that Reilly, the complainant, had worked for the father of the defendant Louis E. Brown, hereafter, for convenience, referred to as Brown, a number of years ago, and that he was acquainted with Brown from his boyhood; out of this acquaintance grew an intimacy between Reilly and Brown which resulted in a series of financial transactions between them involving thousands of dollars, and extending from June 20th, 1913, to June, 1922.

The nature, extent and amounts involved in these transactions were so varied and extensive that six days were occupied in their accounting, and hundreds of exhibits were offered in evidence.

Complainants have filed twenty-two exceptions to the master's report on this accounting, and aside from criticisms of clerical and other immaterial mistakes, these exceptions are addressed to thirteen distinct transactions between Reilly and Louis E. Brown.

Considering these exceptions in their order, and before taking up the consideration of the main issues in the cause,

viz., the alleged conspiracy and the fraudulent conveyances produced thereby, it appears from the proofs that Reilly, in 1912, had built a large and substantial storage warehouse, part of the premises in question, and was engaged in the trucking and warehouse business. To build his warehouse he borrowed, in July and August, 1912, a total of $5,400 on mortgages from the Red Bank Building and Loan Association. These mortgages were paid and were canceled of record on August 5th, 1917.

In September, 1913, Reilly was struck on the head with a crane, and in December following he suffered a stroke of paralysis, and for over two years thereafter he was mentally affected, and was ill until June, 1917, and during this period he was unable to carry on his business. Dr. Young, who treated him daily from January 19th, 1914, until April 29th, 1914, states that during this period Reilly was unconscious for part of the time, that he continued to treat him from time to time until January, 1917, and that in his opinion up to April, 1917, Reilly was not capable of reading or understanding a legal document. The significance of this testimony is that Reilly testifies he has no recollection of many of the transactions to which the exceptions are addressed, and that he has no books, accounts, papers or documents relating to these matters, and because of this condition, and the death of his former wife in 1918, he is without corroboration on many of the items involved in the accounting.

*The first exception* is to a transaction of June 20th, 1913, relating to a chattel mortgage for $1,700, given by Reilly to Brown; but as counsel for complainants states in her brief that it was agreed this matter should be omitted from the accounting and that it is now referred to merely for the purpose of showing that although it took place before Reilly's illness and continued until the mortgage was canceled in May, 1921, that therefore Brown must have known of Reilly's impaired and weakened mentality in 1914, 1915 and 1916, and particularly in 1917, when the second transaction to which exception is taken was entered into. I am unable to follow or to adopt this line of reasoning, but as the exception

is not pressed I will pass to the consideration of *the second exception,* which relates to a mortgage made by Reilly and wife to George F. Borden for $6,500. Borden was the father-in-law of Brown, and it was Brown who obtained this loan for Reilly, because the latter had defaulted in the payment of the dues and interest on the building and loan mortgages for $5,400, above mentioned, and foreclosure proceedings were begun thereon. Brown turned over the proceeds of this loan to his attorneys, Reilly, Quinn & Parsons, and it appears they made disbursements in connection with this loan to the building and loan association, and for taxes and in settlement of judgments, &c., against Reilly, aggregating $6,598.62, or an over payment of $98.62.

Included in these disbursements is the sum of $1,013.75, in satisfaction of a judgment held by Myron V. Brown against Reilly. It is claimed Reilly never heard of this judgment until the check showing its payment was produced on the accounting, and therefore it should not be allowed, and it was also claimed that it should not be allowed for the further reason that the testimony of the witness was not corroborated by a certified copy of the judgment.

I find no merit in either objection, and therefore overrule this *second exception.*

*The third and fourth exceptions* are also addressed to a payment from this $6,500 loan, of $752.25, made by Brown's attorneys to Earling, Johnson & Frake, in satisfaction of a mortgage given them by Reilly and wife in August, 1915. I am satisfied this payment was made for this mortgage, not for a judgment, as erroneously stated in the report, but I do not understand why Brown, having paid the mortgage from the proceeds of this loan, took an assignment of it to himself instead of having it canceled of record, and why under this assignment he kept this mortgage open as a prior lien to the Borden mortgage until August 2d, 1919, when he had it canceled.

It will be recalled that Dr. Young testifies that at the date of this $6,500 loan, on April 3d, 1917, Reilly, in his

opinion, was not capable of reading or understanding a legal document, and it appears that Reilly was present in the attorney's office when these disbursements were made. Reilly states he does not recall the details of this transaction, and claims that he subsequently paid the amount of this $740 with interest to Brown by a series of monthly notes for $50 each. Over twenty-eight months elapsed between the date of the payment to the mortgagees and the unexplained assignment of the mortgage to Brown, and the date of its cancellation. Had Reilly paid Brown the $50 monthly, as he claims, these payments would amount to $1,400, and would make the total cost to him for satisfying this mortgage $2,152.25. Unfortunately, on this transaction, as on others, Reilly is unable to produce the notes, or any checks, receipts or vouchers showing any such monthly payments for this particular purpose, although the record shows many monthly transactions, with notes between him and Brown, and, therefore, notwithstanding this unsatisfactory proof of payment by him, I am inclined, in the absence of a satisfactory explanation from Brown for the assignment of this mortgage to him, to sustain the exception to this item.

I might add in this connection that this $6,500 mortgage was assigned to the defendant Minton, and that the proofs show he paid the full amount thereof for the assignment, and that he had no other connection with the transaction or with Brown or Reilly, and, therefore, as to him I advise that the bill be dismissed.

*The fifth exception* asks that in the master's report the words "notes and loans" be stricken out and the word "deed" substituted therefor, and the record shows that this should be done, except as to one note.

*The sixth exception* merely points out an error of $3.10, and this should be corrected.

*The seventh and eighth exceptions* relate to a credit for $1,300 allowed by the master to Brown for cash claimed to have been paid by Brown for Reilly to Edmund Wilson, and for $550 for an "Errickson note," under the following circumstances:

From about 1905 Reilly had occupied his dwelling-house, part of the premises in question, under an arrangement with the owner, the late Edmund Wilson. In July, 1919, Reilly arranged for the purchase of the property, and through Brown he arranged for a mortgage loan of $4,400 from the Citizens Building and Loan Association of Red Bank, on July 24th, 1919, and on the same day he gave Brown a second mortgage on the property for $3,800; from the total of these loans, amounting to $8,200, disbursements were made by and through Brown, aggregating $8,221.14, and objection is made to the two items mentioned, and which are included in these disbursements, first, because Reilly was not indebted to Wilson for $1,500, and that Brown had no authority to pay it; that Brown never paid it, and that he does not produce any check, receipt or voucher to show any such payment, and that he is without the slightest corroboration of his testimony relating to such payment; the same objections are made to the credit of $550, Errickson note. Reilly claims he has not owed Errickson anything since 1913.

I consider these objections to be well taken, and these exceptions are sustained.

*The ninth exception* is to the master's finding that the mortgage for $4,400 given by Reilly and wife to the Citizens Building and Loan Association had been reduced by monthly payments to $3,872, on May 12th, 1921, the date when the defendant corporation was formed. Complainants contend that as the proofs show that monthly payments of $44 were regularly made from the date of the mortgage to the date of the company's formation, a period of twenty-three months, and amounting to $1,012, that this amount should be deducted from the face of the mortgage, leaving a balance of principal due thereon of $3,388 instead of $3,872, as reported, and this exception is sustained.

*The tenth exception* is to the allowances made to Brown for disbursements aggregating $5,731.98, from the proceeds of a mortgage for $5,700 given by Reilly and wife to Brown, on May 13th, 1920. All of the twenty-nine items of dis-

bursement, involved in this transaction, except two, are disputed by complainants, principally because Reilly states he does not recall them and also because it appears they were paid monthly, and, in at least three instances, over a year after the date of the mortgage. As a matter of fact it appears that two of the items, amounting to over $1,500, including the Cavanaugh judgment, admitted by complainant, were paid by Brown in January and February, 1920, some months before this mortgage was given. The payment of January 19th, 1920, of $378.50, by Brown to A. L. Davison, is claimed by complainant to be included in and secured by a chattel mortgage given by Reilly to Brown under date of February 26th, 1919, under the entry of "blacksmith's charges," and this item will be considered in connection with that chattel mortgage. I am unable to find anything in the record to support this exception, and it is overruled, except as to the adjustment of interest to the dates when the respective items of disbursements were made under this $5,700 mortgage.

*The eleventh exception,* aside from pointing out an error of one dollar in the master's subtraction, accepts the master's report that there was due from Reilly to Brown, on the price of the motor truck in this transaction, a balance of $1,821.25, on May 12th, 1921, the date of the defendant company's incorporation.

*The twelfth exception* is to the finding of a balance of $355, with interest, due from Reilly to Brown on a note dated June 18th, 1920, and endorsed by Brown to enable Reilly to settle with one Ottman. There is nothing in the record to support this exception and it is overruled.

*The thirteenth exception* is to the finding of a balance due of $725, with interest, from Reilly to Brown on a note of Reilly's for $1,422.62, and endorsed by Brown. Counsel for complainants calmly insists that as they claim to have no knowledge of the origin of this note, therefore it should be disregarded. To do this would require that the evidence of this transaction contained in the record should also be disregarded. This exception is overruled.

*The fourteenth exception* is to the same effect, and relates to another note of Reilly's for $1,031, dated July 23d, 1920, and endorsed by Brown, and this exception is overruled.

*The fifteenth exception* is based on the alleged failure of the master to report on two chattel mortgages given by Reilly to Brown, and which were canceled of record on November 18th, 1919.

The first mortgage, dated July 18th, 1917, was to secure $417; the second, dated March 4th, 1918, was to secure $346.66, and it is claimed these mortgages should be accounted for by Brown, and the attention of the master and court is directed to complainants' brief on these mortgages, filed with the master. On an examination of this brief I find the assertion made that on the first chattel mortgage for $417, one George B. Brown, for L. E. Brown, paid Reilly $310, and that the balance of $107 was a bonus charged by Brown, and no evidence is pointed out to support this assertion. Concerning the $346.66, it is claimed that as neither Reilly nor Brown can give any information concerning this transaction, Brown should be required to credit Reilly with the amount of the mortgage, together with interest thereon from the date of the mortgage to the close of the accounting. As there is nothing to support this unique request, this exception is overruled.

*In the sixteenth exception,* counsel objects to the master's statement that she admitted $1,456.96 was due the defendant Myron V. Brown, and she points out an error of $2 in the recording fee, and she now admits that between $1,400 and $1,450 appears to be due this defendant if it be found that he did not, through fraud, obtain from complainants the deed of August 24th, 1920. I have already stated that I found a balance of $50 to be owing by this defendant to Reilly, and I will treat of the alleged fraudulent procurement of the deed in its proper place.

*The seventeenth exception* is to the inclusion in schedule A, attached to the master's report, of notes of (1) June 18th, 1920, for $600, and asserts that not over $96 is due thereon,

but refers to no proof to support this assertion; (2) note of February 10th, 1920, for $1,422.62; this is disposed of in the brief for complainants by the statement "that complainants dispute the entire claim," without any proof to justify this attitude, and (3) note of July 23d, 1920, for $1,031; this is also disputed, and also without any proof to justify the dispute, and this exception is therefore overruled.

*The eighteenth exception* is again addressed to the credit of (1) $1,300, appearing on schedule A, allowed Brown for cash alleged to have been paid to Reilly in connection with the Wilson transaction. As I have already sustained the exception to this allowance, no further consideration need be given it in this connection; (2) to the credit for $752.25, also allowed to Brown, and exception to which I have also sustained; (3) to an error on the part of the master in stating that the $5,700 mortgage is held by the Citizens Building and Loan Association—this mortgage, in fact, is held by Brown, and the building and loan mortgage for $4,400, now reduced to $3,300 or less, is entirely omitted from the schedule. Aside from adding the balance due on the building and loan association mortgage to the schedule, and correcting the name of the holder of the $5,700 mortgage, nothing further is required to be considered under this exception than to remark that considerable time and labor was unnecessarily required to investigate criticisms of the master's report, which prove to be merely captions, as, *e. g.*, the item of the chattel mortgage of March 8th, 1921, for $8,409.62, held by Brown. Counsel for complainants, on her brief, states the master reports the amount of real estate mortgages to be $29,262.08, and to produce this result he includes therein the amount of this chattel mortgage. The most casual examination of the schedule thus criticised shows that the master has not done anything of the kind. Under the caption of "Mortgages," and not "Real Estate Mortgages," he has included the mortgages covering both real and personal property given by Reilly to Brown, and others, except the building and loan mortgage of $4,400, which he omitted, as stated.

It does appear from the proofs that the master reported that there was but $6,409.62 due Brown on this chattel mortgage for $8,409.62, and as the proofs show that Brown relied on the trucks for the payment of their cost to him, he can, as counsel suggests, be left to collect what is due him thereon by the sale of these trucks.

*The nineteenth exception* is addressed again to the validity of the Brown $3,800 mortgage, the Brown $5,700 mortgage, and the Borden $6,500 mortgage, and as these matters have been considered and disposed of there is no necessity for giving them further consideration.

*The twentieth exception* has already been considered and disposed of in connection with two other exceptions.

*The twenty-first and twenty-second exceptions* relate to matters that occurred after Reilly's property was conveyed to Myron V. Brown, and by him conveyed to the defendant company, and if it becomes necessary they can be considered and disposed of on a supplemental accounting.

This disposes of the exceptions, except for the item of $378.50, considered under the tenth exception. After a laborious and extensive examination of the record I have been unable to find any proof to show that this amount was included as claimed by counsel for complainant in any chattel mortgage as "blacksmith's charges," or otherwise, and the objection to its allowance is overruled.

The master found that there was owing from Reilly to Brown, in 1921, without including interest, on six promissory notes, $4,078; that there was owing by Reilly to Brown, on a chattel mortgage dated March 8th, 1921, $6,409.62, without interest, making a total indebtedness due from Reilly to Brown of $10,489. From this must now be deducted the amount of $3,091.35, representing items to which exceptions have herein been sustained, leaving a balance owing by Reilly to Brown of $7,395.55, not including interest.

On August 24th, 1920, Reilly was indebted to the defendant Myron V. Brown for about $1,400. Brown insisted upon payment, and Reilly was unable to pay, and as Reilly at this time was practically insolvent, a deed for the premises in

question was executed by complainants to this defendant. Reilly and his wife state they were told by this Brown, and by the defendant Miss McCormick, the secretary to L. E. Brown, and the notary who took their acknowledgment, that they were signing a mortgage to secure the payment of this indebtedness to Myron V. Brown, and they claim that it was not until two years later, in July. 1922, that they learned, through their counsel, that they had executed a deed for all their real estate. Myron V. Brown and Miss McCormick deny this, and state that the Reillys well knew what they were signing, and that they were willing and glad to do so.

At the time of this conveyance there were liens upon the property, in the form of mortgages, &c., amounting to about $21,000. After the execution of this deed the Reillys continued to occupy the property without the payment of rent, and Reilly used the warehouse for his business purposes and the house for his home; ne paid the water bills, continued to make the monthly payments on the building and loan mortgage, and generally continued, for about a year, to act as the owner of the property without objection and without any interference from Myron V. Brown, and without any claim that he owned the property, until May 12th. 1921, when the defendant the Reilly Storage and Transportation Company was incorporated, and during this entire period neither Myron V. Brown nor Reilly paid any taxes nor any interest upon any of the mortgages that were upon the property.

From the certificate of incorporation it appears the company was formed primarily to continue the trucking and storage business in which Reilly had become engaged, that Reilly and Louis E. Brown and two others were the incorporators; Brown subscribed for one hundred shares. Reilly for three, Gaskill for twenty-three and Marcellus for four shares.

On the organization of the company, Louis E. Brown was elected president; Reilly, vice-president; Marcellus, treasurer, and Gaskill, secretary; the latter withdrew from

the company and sold his twenty-three shares of stock to Marcellus.

At this time, admittedly, Reilly's business and finances, and his affairs generally, were in very bad condition, and he placed his entire reliance upon Louis E. Brown. Reilly is a man of little education and limited intelligence, and, apparently, was then, and from his conduct and his actions before me he still is, willing to be guided and controlled by anyone in whom he has confidence, including his present counsel.

He was present at the organization of the company, voted for and apparently heartily approved all of the resolutions then adopted, including a resolution to purchase from Myron V. Brown the premises in question, the purchase from Louis E. Brown of the horses, wagons, truck and appliances, and other equipment which he was then using in his trucking and storage business, and which he had never transferred to Brown nor to anyone else.

He, apparently, accepted with enthusiasm a resolution adopted by the incorporators making him vice-president of the company, and agreeing to pay him $25 wages weekly for his services to the company and giving him the use, without the payment of rent, of the home he had owned up to that time.

At the organization meeting of the company the customary resolutions were adopted to purchase the Reilly real estate from Myron V. Brown for $1,500 and to purchase Reilly's personal property from Louis E. Brown, although it does not appear that Reilly had ever parted with his title to this personalty, and apparently the only claim or title Louis E. Brown had to it was represented by his chattel mortgage of March 8th, 1921. Some general understanding was had at this meeting that Brown was to turn over to the company the notes and mortgages he held against Reilly, probably for cancellation, and that the company was to pay Reilly's general indebtedness, which then amounted to about $300.

Reilly was present at this meeting and recalls some of the resolutions that were adopted, and it does not appear that

he objected to anything that was done. Mr. Parsons, of counsel with Brown, proposed these resolutions, and at his suggestion the subscribed capital of $13,000 was apportioned, arbitrarily, it is claimed, between the realty and personalty by crediting $1,500 as the value of the equity in the realty and $11,500 as the value of the personalty which the company purchased from Myron V. Brown and Louis E. Brown, respectively.

The only charge against this value of the equity was Myron V. Brown's claim for about $1,450, and the only claim against the personalty was Brown's chattel mortgage nominally for $8,409.62, but actually for only $6,409.62, and it will thus be seen that according to the value stated in the resolutions Reilly had an apparent equity of $5,091 in the personalty. Myron V. Brown conveyed the realty to the company in consideration of $1,500, and subject to mortgages thereon of about $21,000, and other liens amounting to about $1,500, and not including interest on these amounts.

The proof is that at this time the value of Reilly's realty was $25,000, and this valuation gives Reilly an apparent equity of about $2,500 over the mortgage and other liens; adding this to the above value of his equity in the personalty it appears that the total value of Reilly's equity in the realty and in personal property was about $7,591, and for this Reilly received three shares of stock in the company, a job at $25 a week, and the occupancy of his home, rent free, as part of his wages. And his indebtedness to Brown on the notes for $4,078.28, and chattel mortgages for $6,409.62, or a total of $10,487.90, without interest, assumed by the company, was not receipted for, or canceled as agreed upon by either Brown or the company, and interest on these notes has been charged to the date of the accounting, viz., June 14th, 1924, amounting to about $800.

After its incorporation the company continued to carry on Reilly's trucking and storage business in the premises and with his equipment until June, 1922, when it claimed it was found that the trucking branch of the business was unprofitable, and Reilly was thereupon discharged, and was

allowed to take over the trucking business, and the company sold him, from his own equipment, a horse and wagon for that purpose for $150, and notified him to vacate his home by August 1st, 1922.

During the first year of its operation the company claims to have done a gross business of about $14,000, and after paying all expenses and carrying charges it had a balance of $25.

The company claims credit for payments made by it on Reilly's behalf since the date of its incorporation to December 13th, 1923, aggregating $2,911.80, and included in these payments is a charge for recording the deed to the company, for the discount and stamps on notes, presumably the notes from Reilly to Brown, and monthly payments as late as December 13th, 1923, on the building and loan association mortgage, subject to which the company took title from Myron V. Brown, and also for taxes, water bills and insurance premiums, but the company fails to give Reilly any credit for the use and occupancy of his property during the same period.

Reilly was apparently well pleased over the formation of the company; he announced he was free from debt; he told a constable and others who tried to collect executions and other claims against him that he had no property, that he had sold it to the company; he acquiesced in the company's operation of the business, in his discharge from the company, and even in the notice to vacate his home, and he agreed to do so, and he made inquiries about renting another house. He continued in this complacent frame of mind until he consulted his present counsel, in July, 1922, who advised him to resist the attempt which Brown, assisted by others, about August 1st, made to forcibly evict him from his home, and as a part of this plan of resistance the bill in this cause was filed August 2d, 1922, and an amended bill was filed on November 2d, 1922. The relief prayed for therein is: (1) To have the deed from Reilly to Myron V. Brown decreed to be a mortgage, to secure the payment of an indebtedness of about $1,400; (2) to have the deed from

Myron V. Brown to the company declared void, as having been fraudulently obtained; (3) to have the transfer of Reilly's personal property made by Louis E. Brown to the company declared void, as being fraudulently made, without consideration and without title or authority in Brown to make the same; (4) to have the mortgage for $3,800, from Reilly to Brown, dated July 24th, 1919, declared void for want of any consideration; (5) for an accounting and especially for an accounting of bonuses and usury charged Reilly by Brown, and for other relief which has been disposed of under the exceptions.

The accounting has been had with the results stated, and it is found therefrom that the $6,500 mortgage and the $3,800 mortgage are unquestionably valid, and I find nothing in the record to support the charge of usury.

The proofs further convincingly show that the deed to Myron V. Brown was understood and intended by complainants to be merely a mortgage and not an absolute conveyance of all their real estate, and the proofs further show that Myron V. Brown treated it as such, and did not exercise any act of ownership over the property until he conveyed it to the company.

It is contended, however, by the company and by Louis E. Brown that if these facts are established they do not affect the company's title to the property for two reasons:

1. Because it was a *bona fide* purchaser for value.

2. Because complainants are estopped from denying the corporation's title.

In support of the first reason it is argued that the corporation had no knowledge of any defects in Myron V. Brown's title, even if Louis E. Brown had, which is not admitted. The answer to this is that Louis E. Brown was, in fact, the corporation; he formed it and he owned one hundred of the one hundred and thirty shares of the stock it issued; the company was formed by Brown not only to take over Reilly's business and properties, but also to pay all of his indebtedness, including what he owed Brown on notes and mortgages, and this was not done. Furthermore, the company was not

a purchaser for value, according to the resolutions it adopted, for it valued Reilly's equity in the real and personal property at $13,000, and all it paid therefor was $1,500 to Myron V. Brown, and the tax and other such liens, amounting to about $1,500.

The company took title to the personalty from Brown, who had only a chattel mortgage lien on it, and it never paid Reilly nor anyone else the value of the equity of $5,091 therein, which the company by resolution placed upon it.

At the time the company took title to the realty it was valued at $25,000. The principal of the mortgage liens against it was $21,000. This amount and also the taxes and others liens for $1,500, and the $1,500 paid Myron V. Brown, still leaves at least $1,000 of the value of the realty to Reilly unpaid and unaccounted for.

Furthermore, I am unable to reconcile this claim of *bona fide* ownership with the fact that from the date it acquired title, in May, 1921, to December 13th, 1923, the company apparently carried on its books against the property, or against Reilly, or both, an account in which it charged him for recording the deed to it, for taxes, insurance premiums, building and loan association dues, and interest, and particularly for the discount and stamps on notes, and for other payments on Reilly's indebtedness to Brown, which, admittedly, it was agreed should be paid as part of the consideration for the transfer to it of Reilly's trucking and storage business, including all of his equipment, and also all of his real estate. In view of these facts I do not find the proofs to support this contention—that the company was a *bona fide* purchaser for value.

The second reason urged by defendants presents the most difficult question in the case for determination, viz., Is Reilly estopped by his conduct and acquiescence from obtaining the relief he now seeks?

I have recited generally, but in substance, in what this conduct and acquiescence consists, and I have indicated that I found Reilly to be an ignorant, illiterate man, who lacked sufficient intelligence to testify favorably for himself when

given the opportunity. He has a certain amount of shrewdness, but is slow in thought, and hesitating and unsatisfactory in expressing his ideas. He seems to have a general idea that he is indebted to Brown for about $20,000, but he is unable to recall or to state how he arrives at this amount, and this is not surprising in view of the maze of transactions in which he and Brown were engaged for about nine years, and involving loans and payments thereon almost weekly and monthly during this period. He had the utmost confidence in Brown until July, 1922, when he first consulted counsel. He left the keeping of most of the accounts to Brown; he accepted Brown's statements that notes and mortgages for which he gave renewals had been destroyed or canceled, when, in fact, some of them had not; he did not question Brown's right to incorporate his business, he was glad of it. Nor did he question Brown's right to sell all his personal property to the company and to give him three shares of stock in the company and a job at $25 a week, and free house rent. He was apparently relieved of all his anxieties, and greatly pleased over the arrangement, and he continued in this frame of mind even when discharged from his work, and even when he was ordered to vacate his home, and he willingly bought from the company one of his own horses and wagons for $150 to continue in the trucking business, and attempted to rent another home.

Throughout all these transactions Reilly was without competent independent advice. His limited mentality, which was, without doubt, further lessened by the injury to his head, and the stroke of paralysis, did not properly qualify him to understand the exact nature and the complete effect of many, if of any, of the transactions in which he engaged with Brown and the company, and his implicit faith and confidence in Brown as a friend of many years' standing, whose only desire and purpose in these matters was to help him, further lessened his carefulness and aroused no suspicion. The defects in Reilly's intelligence and understanding fully explain his acquiescence and conduct, and also

account for his otherwise inexplicable pleasure over the fact that he had disposed of his business and property that it had taken years of hard work for him to build up and acquire, and that he had stripped himself of everything he had in the world, for three shares of stock in a company in which he was honored with the innocuous office of vice-president, and from which he received a weekly wage of $25 for six days' hard work, together with the privilege of living in his old home, rent free, during the pleasure of the company.

It seems to me that no one possessing ordinary intelligence could possibly act as Reilly did in this matter, and if this conclusion is correct, and from the record and my observation of Reilly on the stand, I haven't the slightest doubt but that it is, then it follows that Reilly cannot be held to the same degree of responsibility for his acquiescence and conduct in this matter that would be charged to a person of ordinary intelligence, acting with or without competent independent advice, and he cannot, therefore, be found estopped from obtaining the relief he now seeks.

My conclusion is that the defendant company should, subject to the limitations hereinafter stated, return and transfer to Reilly all of his personal property, and also convey to him all of the real estate, and unless the parties can agree on the amount due to Reilly, Brown and the company, there should be a supplemental accounting between Reilly and Louis E. Brown, eliminating therefrom all of the items included in the present accounting, and deducting those to which exceptions have been taken and sustained. There should also be an accounting between the company and Reilly, in which the company should be charged the reasonable value for the use it has had of Reilly's real and personal property, and should be credited for all operating expenses of the business and also for all carrying charges on this property, and also for all money paid by it on Reilly's account, or for Reilly's indebtedness on notes, mortgages, chattel mortgages, and including therein $1,450 of the $1,500 paid by the company, or Brown, to Myron V. Brown, for the

conveyance of the property. Such accounting between both Brown and the company and Reilly should also include any and all other items of charge or discharge which are not included herein and in the accounting heretofore had between any or all of the parties.

Upon the filing and approval of the report on these supplemental accounting, if complainants are unable or unwilling to pay the amount then found to be due Brown or the company, or both, a decree will be advised for the sale of so much of the property, real and personal, as may be necessary to provide for such payment, but should payment of such amount be made by complainants, then the transfer and conveyance of the property which I have mentioned shall be made by the company to Reilly.

The terms of the decree in accordance with the views herein expressed may be settled on five days' notice.